# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

RYAN MODERSON, ESTATE OF
MICHAEL PETERSEN, and STEVEN ERATO,

Plaintiffs-Appellants,

v.

CITY OF NEENAH, Sgt. ANGELA EICHMANN,
Lt. SHAUN O'BRE, Lt. TYRON THOMPSON,
Officer JONATHAN KUFFEL, and
Officer MARLYN HEITING,

Defendants-Appellees.

## APPEAL FROM AN ORDER OF
## THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF WISCONSIN,
## THE HONORABLE WILLIAM GREISBACH, PRESIDING
## CASE NO. 1:21-CV-272

## BRIEF OF THE
## PETITIONERS/APPELLANTS
## RYAN MODERSON, ESTATE OF
## MICHAEL PETERSEN, and STEVEN ERATO

WALTER W. STERN III
State Bar No. 1014060
Attorney for Plaintiffs-Appellants

Address:
920 85th Street, Unit 123
Kenosha, WI 53143
(262) 880-0182
Fax: (262) 997-1101
wwstern111@gmail.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

CIRCUIT COURT RULE 26.1 DISCLOSURE STATEMENT .................................... ii

TABLE OF AUTHORITIES ..................................................................................... iii

JURISDICTIONAL STATEMENT ............................................................................1

STATEMENT OF THE ISSUES................................................................................1

STATEMENT OF THE CASE....................................................................................1

SUMMARY OF THE ARGUMENT ......................................................................... 3

ARGUMENTS........................................................................................................... 3

I.     Defendant-Appellees were not entitled to Summary Judgment ......................... 3

II.    Defendant-Appellees are not entitled to Qualified Immunity............................ 4

III.   The Defendants did not have probable cause to detain the Plaintiffs ................ 6

IV.    Defendant Angela Eichmann should not be dismissed.................................... 13

V.     Plaintiffs' punitive damages claim should not have been dismissed............... 13

CONCLUSION........................................................................................................ 15

CERTIFICATE OF COMPLIANCE......................................................................... 16

CERTIFICATE OF SERVICE ................................................................................. 17

CIRCUIT RULE 30(d) STATEMENT...................................................................... 18

APPENDIX SUMMARY ......................................................................................... 19

APPENDIX ......................................................................................................A-1-13

*Ryan Moderson, Estate of Michael Petersen, and Steven Erato v. City of Neenah, Angela Eichmann, Shaun O'Bre, Tyron Thompson, Johnathan Kuffel, Marlyn Heiting, Steven Doe and Sally Roe*
Appeal No. 23-2843

CIRCUIT COURT RULE 26.1 DISCLOSURE STATEMENT

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3): *Ryan Moderson, Estate of Michael Petersen, and Steven Erato*

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court: *Walter W. Stern III*

(3)　If the party is a corporation: *Not applicable.*

(4)　　Attorney's Signature:　　Dated: January 9, 2024

_____

Walter W. Stern III
State Bar No. 1014060
Attorney for Plaintiffs-Appellees

Please indicate if you are Counsel of Record for the above listed parties pursuant to Circuit Rule 3(d). Yes _X_　　No ___

Address:　　920 85th Street, Unit 123
Kenosha, WI 53143
(262) 880-0192/Fax: (262) 997-1101
Email: wwstern111@gmail.com

**TABLE OF AUTHORITIES**

Case                                                                 Page(s)

*Anderson v. Creighton*, 483 US 635, 638-39 (1987)...................................................4

*Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006) ...................................10

*Bailey v. United States*, 568 U.S. 186, 193 (2013)...................................................11

*Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964)...........................................8

*Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009)................................4

*Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).......................................................9

*Dunaway v. New York*, 442 U.S. 200, 213 (1979)..................................................10

*Estate of Brown v. Thomas*, 7 F. Supp. 3d 906, 909 ................................................4

*Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) .............................................................6

*Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986).....................................7

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)...................5

*Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994) ...............................................8, 12

*Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007).............................7

*Hunter v. Bryant*, 502 US 228, 112 S. Ct. 537 ......................................................8, 12

*Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998) ...............................................5

*Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998)..................................................9

*Kisela v. Hughes*, 138 S. Ct. 1148, 1151, 200 L. Ed. 2d 449 (2018) .........................4

*Malley v. Briggs*, 475 U.S. 335, 341 (1986)...........................................................5

*Manuel v. City of Joliet*, 137 S.Ct. 911, 917 (2017)................................................6

*Molina v. State*, 53 Wis.2d 662, 670, 193 NW2d 874, 878 (1972) ..........................7

*Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ...............................................................6

*Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 524 (7th Cir. 2001.................7

*Saucier v. Katz*, 533 U.S. 194, 201 (2001) ...............................................................4

*Soderbeck v Burnett County*, 745 F. 2d 285, 290 (7th Cir. 1985) ...........................................13

*Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). ..............................3

*State v. Brown*, 392 Wis.2d 454, 501 (Wis. 2020).....................................................14

*State v. Koch*, 175 Wis.2d 684, 701, 499 NW2d 152, 161 (1993) ...........................................7

*State v. Richardson*, 156 Wis.2d 148, 456 NW2d at 838 ..........................................................8

*United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003).....................................................11

*Viilo v. Eyre,* 547 F.3d 707, 709 (7th Cir. 2008).........................................................5

*Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000)...................................................9

United States Constitution

Art. IV ...............................................................................................................7

Wisconsin Constitution

Art. 1, § 11 ...............................................................................................................7

Statutes

28 U.S.C. § 1331 ...............................................................................................1

42 U.S.C. § 1983 ...............................................................................................1

Rules

Fed. R. Civ. P. 56(a) ...............................................................................................3

Other Authorities

*Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124, 1142 (2012)...................................14

# JURISDICTIONAL STATEMENT

The district court had jurisdiction of the case that is docketed 23-2843 pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. A final decision of the U.S. District Court for the Eastern District of Wisconsin was entered on September 5, 2023 by the Honorable William C. Griesbach. The United States Court of Appeals has jurisdiction to decide this case pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983. No motion for a new trial or alteration of the judgment or any other motion that would have tolled when the time to appeal was filed. The Notice of Appeal was filed on September 22, 2023. This is not an appeal from a decision of a magistrate judge.

# STATEMENT OF THE ISSUES

1. Did the Defendants-Appellees have probable cause to detain the Plaintiffs-Appellants?

    DISTRICT COURT ANSWER:    No.

2. Should the City of Neenah be released dismissed pursuant to *Monell*?

    DISTRICT COURT ANSWER:    Yes. Plaintiffs-Appellants do not dispute this ruling and will not address this issue in the Brief.

3. Should Defendant-Appellee Angela Eichmann be dismissed from the suit?

    DISTRICT COURT ANSWER:    Yes.

4. Should Plaintiffs-Appellants' punitive damages claim be dismissed?

    DISTRICT COURT ANSWER:    Yes.

# STATEMENT OF THE CASE

On December 5, 2015, a lone, armed man, Brian Flatoff, took hostages at Eagle Nation Motorcycles in Neenah, Wisconsin. There were initially six hostages taken. Two of the hostages,

Ethan Moderson and George Fuente, were able to exit the premises during the hostage taking. Plaintiff Steven Erato was located in the basement of the premises; Plaintiffs-Appellants Ryan Moderson and Michael Petersen, together with the late Michael Funk, were on the main floor when Brian Flatoff took them hostage. Several calls were made to 911 by Steven Erato and Vance Dalton. Erato told dispatch at 8:56 a.m. that "a person is in the building with a gun, acting like a lunatic…" He indicated there is an "active shooter." (WDCI Case Report Number 15-6622/76, p. 7). Vance Dalton told dispatch at 9:02 a.m. that "Flatoff was 45 years old with a long beard and long hair…" (WDCI Case Report Number 15-6622/76, p. 1) Each of those calls indicated there was one armed gunman at Eagle Nation and several hostages. Additionally, Gerald Ehlke went to the Neenah Police Department after hearing a voice message left for him by Brian Flatoff which indicated to him that Flatoff could be a threat to Eagle Nation. (Ehlke Affidavit dated 7/17/23) After Ethan Moderson was allowed to leave, Defendant Angela Eichmann handcuffed him, put in the back of a police car and questioned him. He was subsequently released after advising Sgt. Eichmann that there was one gunman and that his father (Plaintiff Ryan Moderson) was still being held in the building.

Despite the credible knowledge of what was happening inside Eagle Nation and that there was one gunman holding hostages, the Neenah Police Department made the reckless determination that there "were no hostages" and that the hostages were attempting an "ambush." This is despite all information to the contrary and was based upon a deep seeded bias against Eagle Nation, which was thought to be a "motorcycle gang" by the Neenah Police Department. Officers Kuffel and Hoffer, particularly, made the fatal decision to shoot and kill Michael Funk, the owner of Eagle Nation, as he exited the hostage situation. As the remaining Plaintiffs-Appellants exited the building, they were questioned, handcuffed, placed in police cars and taken to the Neenah Police

Station for questioning despite the officers having no probable cause to detain the Plaintiffs-Appellants.

Plaintiffs-Appellants' liberties were taken away, they were treated as criminals, not victims, with no probable cause to detain them, nor any evidence that there was a crime committed by anyone except the hostage taker. They were all subsequently released from custody.

## SUMMARY OF THE ARGUMENT

The District Court erred when it incorrectly granted summary judgment to the Appellees when it found Plaintiff-Appellants' due process rights were not violated, that qualified immunity for the officers was appropriate, that Defendant-Appellee Angela Eichmann should be dismissed from the lawsuit and that punitive damages should not be awarded.

## ARGUMENT

I.    Defendants-Appellees are not entitled to Summary Judgment

Defendants-Appellees sought summary judgment, pursuant to Rule 56, which states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment must demonstrate that no genuine issue of material fact exists for trial and that the movant is entitled to judgment as a matter of law.

Summary judgment is proper if the moving party "shows that there is no genuine disputes to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). In considering the factual evidence, a court must construe all facts and reasonable inferences in the light most

favorable to the plaintiff as the non-moving party. *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009); *Estate of Brown v. Thomas*, 7 F. Supp. 3d 906, 909.

In the instant matter, there is no question of an important issue of material fact, that being whether or not Plaintiffs-Appellants were denied due process and were arrested without any probable cause of committing a crime. Summary Judgment should be granted on facts, not assumptions. Erroneous, biased assumptions made by the Defendant Police Officers are what led to the Plaintiffs-Appellants' being unconstitutionally detained. This Court should reverse the Circuit Court's granting of summary judgment to the Defendants-Appellees.

II.     Defendants-Appellees are not entitled to Qualified Immunity

Defendants-Appellees asserted that even if their actions were deemed unreasonable, the doctrine of qualified immunity shields them from liability. The doctrine of qualified immunity protects officers "who act in ways they reasonably believe to be lawful" from liability. *Anderson v. Creighton*, 483 US 635, 638-39 (1987). In order to determine whether qualified immunity applies, the Court must address two questions to determine whether the doctrine of qualified immunity applies; although, the Court need not determine them in order. *Id.* at 691. The Court must determine whether the facts, when taken in the light most favorable to the Plaintiffs-Appellants, show that the Defendants-Appellees violated a constitutional right and the Court must determine whether that constitutional right was clearly established at the time of the alleged violation. *Id*. (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). This right must be defined with adequate specificity. *Kisela v. Hughes*, 138 S. Ct. 1148, 1151, 200 L. Ed. 2d 449 (2018).

The right to be free from arrest without probable cause has been clearly established.

4

*Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998). Because qualified immunity protects all "but the plainly incompetent or those who knowingly violate the law," a law enforcement officer will be immune to claims based on an arrest without probable cause unless "it is obvious that no reasonably competent officer" would have believed that there was probable cause to arrest. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In the instant case, there simply was no probable cause to arrest the Plaintiffs-Appellants. They had committed no crime, nor did any of them attempt to commit a crime. They were victims of a hostage taking. A reasonably competent officer would have taken all of the available information which had been dispatched to them, to wit: there was one armed gunman and several hostages, and acted in accordance with that knowledge. The Defendants-Appellees did not do so. By her own admission, Defendant-Appellee Eichmann had been told by Ethan Moderson, a hostage who was allowed to leave the building, that there was one gunman and that his father and others were being held hostage. This information certainly was conveyed to the other Defendants-Appellees. The dispatch operators advised not only that there was a lone gunman, but described in some detail what he looked like, what he was wearing and what his name was. There was no conflicting information; at no time did anyone assert there was more than one gunman. The Defendants-Appellees ignored all facts and arrested the Plaintiffs-Appellants hostages without probable cause.

Qualified immunity protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Viilo v. Eyre,* 547 F.3d 707, 709 (7th Cir. 2008). In this case, a reasonable police officer, having been told there was one armed gunman and numerous hostages, would not have treated said hostages as criminals with no credible evidence to jump to that conclusion except their inherent bias toward Eagle Nation.

5

There is a presumption of qualified immunity regardless of the actions of the law enforcement officials. The bar is seemingly set so high that only rare, extremely serious and, most of the time, highly publicized cases are even questioned as to a qualified immunity claim. Qualified immunity does not justify police officers ignoring objective facts which would promote dangerous and haphazard policing.

The Court is urged to take a fresh look at the issue of qualified immunity and determine whether all actions taken on the part of law enforcement in this case should be deemed acceptable and subject to qualified immunity.

III.    The Defendants-Appellees did not have probable cause to detain the Plaintiffs-Appellants

This is a relatively simple case, i.e., were the Plaintiffs-Appellants detained without probable cause that a crime had been committed? The 4th Amendment "establishes the minimum constitutional 'standards and procedures' not just for arrest but also for ensuing 'detention.'" *Manuel v. City of Joliet*, 137 S.Ct. 911, 917 (2017) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). "The touchstone of the Fourth Amendment is reasonableness. Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The 4th Amendment is designed to protect people from being stopped or detained without probable cause. There was nothing reasonable about detaining individuals who had just been held hostage by a lone gunman and whose friend and coworker had been killed by a Neenah Police Officer. They were victims, not criminals. There was no probable cause to detain them.

"In making a decision to arrest someone for criminal conduct that he did not witness, a police officer may rely on information provided to him by the victim or by an eyewitness to the

crime that the officer reasonably believes is telling the truth." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007) (citing *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 524 (7th Cir. 2001), *Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986)). Ironically, the victims in this case, to wit: the hostages, did provide information to the officers and that information was there was a lone armed man who had taken the occupants at Eagle Nation hostage. There were also several eyewitnesses who reported the exact same information. Both Ethan Moderson and George Fuente advised Defendant-Appellee Eichmann of the occupants at Eagle Nation, that there was one gunman and several hostages. Plaintiff-Appellant Ryan Moderson advised Defendant-Appellee Heiting of the same information. They were all eyewitnesses that they had escaped the building. So, the Defendants-Appellees had eyewitness information that they chose to ignore and detained the Plaintiffs-Appellants despite this knowledge. There was no reason to assume the information given to the police was untruthful, yet without any probable cause, the Plaintiffs-Appellants were detained.

Every warrantless arrest must be supported by probable cause. *Molina v. State*, 53 Wis.2d 662, 670, 193 Nw2d 874, 878 (1972); U.S. Const. amend, IV; Wis. Const. art. 1, § 11. A police officer has probable cause to arrest when the totality of the circumstances within that officer's knowledge at the time of the arrest would lead a reasonable police officer to believe that the defendant probably committed a crime. *State v. Koch*, 175 Wis.2d 684, 701, 499 NW2d 152, 161 (1993). The Defendant-Appellee officers had been given information from the 911 dispatchers that there was one gunman; Defendant-Appellee Eichmann had been informed by a hostage who was allowed to exit the building that there was one gunman and several hostages at Eagle Nation. 911 dispatchers received several independent reports regarding the gunman, a description of the gunman, and the gunman's name. It was not speculative as to the gunman's identity, nor that there

were hostages in the building. There was nothing reasonable about the actions of the Neenah Police Officers; there was nothing to indicate any crime had been committed by anyone except the hostage taker, Brian Flatoff. The objective facts before the police officer need only lead to the conclusion that guilt is more than a possibility. *State v. Richardson*, 156 Wis.2d 148, 456 NW2d at 838. The objective facts in this case were not speculative. There was one gunman and there were several hostages. Those were the uncontroverted facts as stated to the 911 dispatchers and Defendant-Appellee Eichmann.

Pursuant to the WDCI Case Report Number 15-6622/75, p. 1, dispatch "stated that the shooter's name was "Brian" who had long hair and a long beard." This information was relayed at 9:02 a.m., shortly after the hostage taking event commenced. At 9:35 a.m., dispatch "relayed that it was believed that there was 3 hostages (1 in the basement and 2 with the suspect.)" (WDCI Case Report Number 15-6622/75, p. 2) There was not a single fact or piece of evidence that would lead to a conclusion that the Plaintiffs-Appellants were guilty of anything except being in the wrong place at the wrong time. This is certainly not probable cause for an arrest.

The existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently received information. *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994). "[i]f, 'at the moment the arrest was made… the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that" the arrestee was committing or had committed a crime. *Hunter v. Bryant*, 502 US 228, 112 S. Ct. 537. "Whether that [the defendant's] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it…" *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964). "[a] warrantless arrest by a law officer is reasonable under the Fourth

Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); see also, *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000). "Police officers have probable cause to arrest an individual when `the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed' an offense." Id. (quoting *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998)).

Plaintiffs-Appellants assert that the information known to the officers at the moment of the arrests was that Plaintiffs-Appellants were hostages being held by a lone armed man, Brian Flatoff. There was not one shred of evidence or police intelligence that would lead a reasonable police officer to believe any crime had been committed by any of the hostages. In fact, it was exactly the opposite. Police personnel knew that there was one gunman and only one gunman. Hostage negotiator Kathryn Voelker spoke with Plaintiff Michael Petersen at approximately 9:30 a.m. via telephone who advised her that "there was one male holding three people hostage with a MAC-10 and two magazines. (Voelker narrative, pg. 1) Most damning to Defendants-Appellees' position is the fact that Voelker spoke directly with Brian Flatoff at 9:44 a.m. wherein he admits he is the hostage taker, that he has a gun and that "there is only one outcome to this. That is if they don't get off of my shit and get my motorcycle back I am going to put a bullet in my head." (Voelker narrative, pg. 2) Defendant-Appellee Heiting specifically states in his Incident Report that he provided Defendant-Appellee Kuffel with the information obtained from Plaintiff-Appellant Ryan Moderson regarding the hostage taker being named Brian, that he was a hostage and that "ML" was still inside with the hostage taker. (Incident Report of Marlyn Heiting, p. 5 of 17) The factual evidence that there was one armed hostage taker with the remaining people at Eagle Nation being hostages is uncontroverted. Because Defendant-Appellee Officers Kuffel and Hoffer ignored the

myriad of facts and reports given to them by Neenah Police personnel and arbitrarily and erroneously concluded that there "were no fucking hostages" (Kuffle Dep. p. 94), does not make it so. There are no "alternate facts" in this situation. Their conclusion was not based on sound policing; it was based upon a long-held bias against Eagle Nation by the City of Neenah Police Department. In fact, at the time of the incident, there was a pending lawsuit against the City of Neenah Police Department by Plaintiff-Appellant Erato and the late Michael Funk resulting from a raid which took place at Eagle Nation in September of 2012, to wit: Eagle Nation Cycles, et al v. City of Neenah et al, Case No. 1:14-cv-01503. Plaintiffs-Appellants aver that the biases sprung from that incident, together with other police involvement over the years.

To succeed in a claim for false arrest, the claim requires an arrest be made "without probable cause." *Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006). This is a textbook case of being arrested without probable cause that a crime had been committed. This is a clear case of police officers with a pre-determined bias against the individuals who were in Eagle Nation on December 5, 2015 using the circumstance of them being held hostage to detain them. They detained the Plaintiffs-Appellants without a cause. Plain and simple. The Plaintiffs-Appellants' claims under the 4th and 14th Amendments to the United States Constitution must prevail under law.

Defendants-Appellees cited *Dunaway v. New York*, 442 U.S. 200, 213 (1979) in support of their motion for summary judgment. Interestingly, the court in *Dunaway* actually held that the "police had violated the 4th and 14th Amendments when, without probable cause to arrest, they seized petitioner and transported him to the police station for interrogation" (pp. 206-216). This case is perfectly on point with the instant case.

Defendants-Appellees also cited *Bailey v. United States*, 568 U.S. 186, 193 (2013) in support of seizing the Plaintiffs-Appellants without probable cause. The main thrust of *Bailey* held that "the detention of the occupants of the premises allowed under Summers is spatially constrained and limited to the immediate vicinity of the premises to be searched." The instant matter is not a search and seizure case, nor a search warrant case. In fact, *Bailey* goes on to caution that the *Summers* "exception to the Fourth Amendment rule prohibiting detention absent probable cause must not diverge from its purpose and rationale." Again, there was no purpose or rationale to detain the Plaintiffs-Appellants and there should be no 4th Amendment exception on the necessity of probable cause for an arrest.

*United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) is on point and supports Plaintiffs-Appellants' case as it qualifies that detention "depends on what the officers knew at the time of the seizure." At the time of the seizure, the officers knew there was one gunman and numerous hostages pursuant to 911 dispatch and Defendant-Appellee Eichmann's personal knowledge based upon the interrogation of an escaped hostage. The facts which were known were those given to the Neenah police by Neenah police personnel. Those were the known facts, not the incorrect and deadly "conclusions" which the Neenah Police officers made without benefit of any first-hand information.

In the Defendants-Appellees' motion for summary judgment, they admitted that the "officers learned firsthand from Ethan Moderson that the reported hostage taker had a gun." (DPFF ¶ 31) The officers also received a "dispatch report that an armed gunman was holding an unknown number of hostages." (DPFF ¶¶ 14-22) These admission directly supplement Plaintiffs-Appellants' contention that a detention must be made based on "what the officers knew at the time

of the seizure." *Id.*; see also, *Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994); *Hunter v. Bryant*, 502 US 228, 112 S. Ct. 537.

In their summary judgment motion, Defendants-Appellees' contradict themselves when discussing that Defendant-Appellee Heiting conducted "an interview of Plaintiff Moderson who have (sic) him valuable information about what was occurring in the building" and that "Moderson identified 4 people who remained in the building." (DPFF ¶¶ 87-95). This, again, supports Plaintiffs-Appellants' claims. The Neenah police officers had direct knowledge of the hostage taker and the hostages remaining in the building. There should have been no question as to the fact that there was a lone gunman and four hostages and that said hostages had not committed any crime.

Lastly, in his deposition conducted on May 30, 2023, Defendant-Appellee Heiting admits that Plaintiff Erato committed no crime on December 5, 2015. He stated:

"Q   And what crimes or crime when Steve was placed in custody and then handed off to you were you aware that he committed?
THE WITNESS:  I do not know.  I do not know.
Q    Did you learn during the course of –
A    That he committed a crime?
Q    Yes.
A    I don't believe so, no."

(Heiting Dep. of 5/30/23, pp. 14-15)

The Defendants-Appellees' statements and admissions in their motion for summary judgment and Defendant-Appellee Heiting's own deposition should have defeated said motion in that there was no probable cause to handcuff, detain and seize the Plaintiffs-Appellants or any of the other hostages not party to this action. The Circuit Court erred when dismissing the Plaintiffs-Appellants lawsuit and same should be remanded back for trial.

IV.     Defendant-Appellee Angela Eichmann should not be dismissed

Defendant-Appellee Eichmann should not be dismissed from the suit.  Not only was she in charge of the operation, she handcuffed, searched and detained two hostages, Ethan Moderson and George Fuerte.  She possessed direct knowledge that there was one armed gunman who was a white male with long hair and that there were hostages remaining in the building.  As she was the Sargent in charge of the police response, one could surmise that she relayed this direct knowledge to the other officers, particularly Kuffel, Hoffer and O'Bre, the three officers who, without any reasonable facts, determined that there were "no hostages."  If she did not relay the description of the hostage taker and the fact that the individuals in the building were indeed hostages, then she would be even more liable for the unlawful arrest of the Plaintiffs-Appellants after they exited the building.   Defendant-Appellee Eichmann should not have been dismissed from the suit and the matter should be remanded back to the Circuit Court for a jury trial.

V.     Plaintiffs-Appellants' punitive damages claim should not have been dismissed

Plaintiffs-Appellants' punitive damages claim should not have been dismissed. Defendant-Appellee Officers Kuffel and O'Bre, particularly, exhibited reckless and wanton disregard for the Plaintiffs-Appellants safety and welfare.  They shot at them while they were seeking shelter inside Eagle Nation.  They shot at them with bias and in contradiction to any relevant factual information they had been given.  Defendants-Appellees cited *Soderbeck v Burnett County*, 745 F. 2d 285, 290 (7th Cir. 1985) in support of dismissing the punitive damage portion of the Plaintiffs-Appellants' claim in that there was no "reckless or callous indifference to the federally protected rights of others."  I cannot think of anything more reckless or callously indifferent than arbitrarily determining that hostages were criminals, shooting at unarmed hostages, killing a hostage who escaped the building, and arresting individuals knowing they had

13

been the victims of an armed hostage taking and having not committed a crime. Defendant-Appellees Kuffel and O'Bre acted maliciously and without concern for the safety and well-being of the hostages. They acted with bias and malice against the hostages.

The Neenah Police Department had raided Eagle Nation Motorcycle Shop in 2012; Defendant-Appellee Hoffer wrote the search warrant. Defendant-Appellee Eichmann stated she was familiar with Eagle Nation because of the police department's past dealings with the business, although none of those past encounters involved armed felonies. There was an absolute bias against Eagle Nation, the most blatant of which being the statement made by Defendant-Appellee Hoffer and recorded on Officer Raymond Berna's squad video after the shooting of hostage Michael Funk, to wit: "fuck that, I could care less right now if he is dead." (WDCI Case Report, No. 15-6622/77, Page 2, 9:46 a.m.) That is reckless disregard and bias against Eagle Nation and the hostages which were held there. (WDCI Case Report, No. 16-6622/84, Page 5)

Research demonstrates that "[i]mplicit biases translate most readily into discriminatory behavior … when people have wide discretion in making quick decisions with little accountability." Jerry Kang, et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124, 1142 (2012), see, *State v. Brown*, 392 Wis.2d 454, 501 (Wis. 2020). Defendants-Appellees Kuffel and O'Bre blatantly showed their bias in their actions in actively shooting at the hostages while they were in the Eagle Nation building and the fact that they shot a hostage that looked absolutely nothing like the description of the shooter that had been given to them not only by dispatch, but by Defendant-Appellees Sgt. Eichmann, Officer Heiting and hostage negotiator Kathryn Voelker.

The case should be remanded back to the Circuit Court for further prosecution and the punitive damages portion of Plaintiffs-Appellants' claim should survive.

**CONCLUSION**

For the above-mentioned reasons, the Plaintiff-Appellants pray that The Court of Appeals should reverse and remand the September 5, 2023 Order granting the Appellees Summary Judgment which was entered at the District Court for the Eastern District of Wisconsin.

Dated at Kenosha, Wisconsin, this 9th day of January, 2024

By:      *electronically signed by Walter W. Stern III*
         WALTER W. STERN III
         Counsel for Plaintiffs-Appellants-Appellants
         920 85th Street, Unit 123
         Kenosha, WI  53143
         (262) 880-0192/(262) 997-1101
         wwstern111@gmail.com

## CERTIFICATE OF COMPLIANCE WITH

## FRAP RULE 32(A)(7), FRAP RULE 32(G) AND CR 32(C)

The undersigned, counsel of record for the Plaintiff-Appellants, Ryan Moderson, Estate of Michael Petersen and Steven Erato, furnishes the following in compliance with F.R.A.P. 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P. Rule 32(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is 4678 words.

*electronically signed by Walter W. Stern III*
Walter W. Stern III
State Bar No. 1014060
Attorney for Plaintiffs-Appellants

920 85th Street, Unit 123
Kenosha, WI 53143
(262) 880-0192/(262) 997-1101
wwstern111@gmail.com

**CERTIFICATE OF SERVICE**

The undersigned, counsel for the Plaintiff-Appellants, Ryan Moderson, Estate of Michael Petersen and Steven Erato, hereby certifies that on January 9, 2024, Plaintiffs-Appellants' Brief and Short Appendix was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated this 9th day of January, 2024

*electronically signed by Walter W. Stern III*
Walter W. Stern III
State Bar No. 1014060
Attorney for Plaintiffs-Appellants

920 85th Street, Unit 123
Kenosha, WI  53143
(262) 880-0192/(262) 997-1101
wwstern111@gmail.com

**CIRCUIT RULE 30(d) STATEMENT**

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

Dated this 9th day of January, 2024

*electronically signed by Walter W. Stern III*
Walter W. Stern III
State Bar No. 1014060
Attorney for Plaintiffs-Appellants

920 85th Street, Unit 123
Kenosha, WI 53143
(262) 880-0192/(262) 997-1101
wwstern111@gmail.com

# REQUIRED SHORT APPENDIX

Decision and Order Granting Defendants' Motion for Summary Judgment .........................A1-12

Judgment of Hon. William Greisbach..................................................................................... A-13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RYAN MODERSON,
ESTATE OF MICHAEL PETERSON, and
STEVEN ERATO,

> Plaintiffs,

> v.                                          Case No. 21-C-272

CITY OF NEENAH, ANGELA EICHMANN,
SHAUN O'BRE, TYRON THOMPSON,
JOHNATHAN KUFFEL, MARLYN HEITING,
STEVEN DOE, and SALLY ROE,

> Defendants.

---

## DECISION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

This lawsuit arises out of the tragic consequences that unfolded when local law enforcement officers responded to an attempt by Brian Flatoff to take hostages at a motorcycle shop in Neenah, Wisconsin. *See Mason-Funk v. City of Neenah*, 895 F.3d 504 (7th Cir. 2018). Ryan Moderson, Michael Peterson (by his estate), and Steven Erato, who were held hostage at gunpoint by Flatoff, brought this action against the City of Neenah and the responding officers, Lt. Angela Eichmann, Lt. Shaun O'Bre, Lt. Tyron Thompson, Lt. Jonathan Kuffel, and Officer Marlyn Heiting,[1] alleging that their constitutional rights were violated when the officers improperly detained and/or arrested them after Michael Funk, another hostage, was mistakenly shot and killed by police and Flatoff was taken into custody. The case is before the court on

---

[1] The Clerk is directed to correct the caption to reflect that Defendant Heiting's name is "Marlyn Heiting," not "Marly Heiting."

Defendants' motion for summary judgment. For the following reasons, the motion will be granted and the case dismissed.

## BACKGROUND

On December 5, 2015, at 8:56 a.m., Winnebago County dispatch advised the City of Neenah Police Department that there was a weapons call at Eagle Nation, a motorcycle shop located in Neenah, Wisconsin, that a subject in that business had fired a shot, and that officers should respond to that location. Lt. O'Bre, the on-duty patrol supervisor for the City of Neenah Police Department on that day, was in the police station when he received the dispatch call and immediately responded to the scene. Lt. O'Bre was advised by radio that a man inside the building was armed with a MAC-10 weapon, that there were two or three hostages inside, and that it was an active hostage situation. Based on the information provided, Lt. O'Bre believed that there was an armed and dangerous subject inside the business who was holding innocent people against their will. Lt. O'Bre was informed by dispatch that the subject had long hair and a beard, was wearing a flannel shirt, and identified as Brian Flatoff. Dispatch did not provide any description of the hostages.

Officer Hoffer understood that there was a hostage-taker, name unknown, and several hostages at Eagle Nation whom the hostage-taker threatened to kill in five minutes. He also understood that the hostage-taker was wearing a flannel shirt and had long hair. Officer Hoffer did not know the names of any of the hostages.

Officer Ross also understood that there was a hostage-taker, there were two to three hostages, shots had been fired, and the hostage-taker had imposed a five-minute deadline. He learned further that the hostage-taker was wearing either plaid or flannel and had long hair and a possible beard. Like Officer Hoffer, Officer Ross did not know any of the hostages' names.

2

Upon arrival, Lt. O'Bre advised area units to set up a perimeter on the business. Lt. O'Bre advised that the perimeter should be "invisible containment" so as not to give away the officer's location or presence. As Lt. O'Bre was setting up the perimeter, Officer Heiting stated over the radio that a truck was leaving the building. Dispatch subsequently advised that the shooter was leaving in a truck, so the officers left their locations and moved to intercept the vehicle.

Sgt. Eichmann and Officer Ross stopped the vehicle and ordered the driver out of the vehicle with his hands up. The driver complied and got on the ground. The officers identified the driver as Ethan Moderson, handcuffed him, and searched him. Ethan Moderson told Officer Ross and Sgt. Eichmann that he had just left Eagle Nation and that there was a white male with long hair inside the building with a gun. He reported that his father, Ryan Moderson, was inside Eagle Nation and had motioned Ethan to get out of the building, so Ethan did. Sgt. Eichmann and Officer Ross interviewed Ethan Moderson for about one minute before releasing him.

After dispatch reported that a man with a gun was still inside Eagle Nation, Lt. O'Bre asked Sgt. Eichmann to manage the perimeter so that Lt. O'Bre could set up a "hasty team," or a patrol response team, to enter Eagle Nation from behind Gord's Bar. As Lt. O'Bre was forming the hasty team, Lt. Kuffel arrived and took the team over. Lt. Kuffel heard a statement over the radio that, if officers were not in the building in one minute, people were going to die. Lt. Thompson and Officer Hoffer then arrived on the scene. Lt. Kuffel started to stack the officers to enter Eagle Nation. Lt. Kuffel determined it was necessary to enter the building because there was a countdown and it was a rapidly evolving situation.

Once the officers entered Eagle Nation, they voiced multiple identifications and warnings including, "police," "get down," "get on the ground now," "show me your hands," "see your hands," and "get down in front now." Defs.' Proposed Findings of Fact (DPFOF) ¶ 41, Dkt. No. 61. Within a few seconds of entering the building, Lt. Thompson and Lt. O'Bre fell down the

3

stairs just inside the doorway. Upon entry, Lt. Kuffel noticed a large amount of mechanical-type equipment, including motorcycles and toolboxes, that limited their ingress. Lt. Kuffel also saw two individuals only from their shoulders up. Defendants contend that Lt. Kuffel believed the individuals were splitting up and moving in opposite directions as if they were trying to flank the officers. *Id.* ¶ 46. Officer Koffer observed the individuals spread out throughout the shop area and hide behind objects in the building as if in positions of cover. *Id.* ¶ 48. Plaintiffs assert that Moderson, Funk, and Peterson did not surround officers as if they were going to ambush them. Pls.' Resp. to DPFOF ¶ 46, Dkt. No. 69.

In any event, instead of compliance with police commands from any of the individuals inside the shop, the hasty team was met with a hail of gunfire. One of the first rounds fired struck Officer Hoffer in the helmet. Shortly after the gunfire erupted, a large white cloud appeared inside the building. It was later determined that the white cloud was the result of a bullet striking a fire extinguisher. Lt. Kuffel could not identify the individual or individuals doing the shooting or how many people were shooting and felt the percussion of the rounds being fired on the right side of his face. He heard Officer Hoffer yell, "I'm hit," and saw Officer Hoffer on his back. DPFOF ¶ 54. Lt. Kuffel noticed that Lt. O'Bre and Lt. Thompson were gone. Unable to identify the source of gunfire, Lt. Kuffel used target-specific directed fire to keep the shooter down after seeing Officer Hoffer on his back. After the hasty team was fired upon and returned fire, they disengaged and withdrew from the building.

Upon their retreat from Eagle Nation, officers again attempted verbal contact, which was met with more gunfire. At this point, Lt. Kuffel stated, "There are no . . . hostages." *Id.* ¶ 58. The officers' perception that everyone in the building failed to follow commands as well as the immediate and heavy volume of gunfire led Lt. Kuffel, Officer Hoffer, and Officer Ross to conclude that the officers were facing an ambush, rather than a hostage situation. Lt. O'Bre

4

believed that what the officers had responded to was not what it was reported to be and could have been an ambush.

Soon thereafter, Lt. Kuffel was advised that two individuals were coming out of the back door of Eagle Nation, and he set up two arrest teams to take them into custody. Lt. Kuffel took Peterson into custody, handcuffed him, walked him toward the officers' location near Gord's Bar, and turned him over to Officer Heiting. Lt. Kuffel asked Peterson who was shooting at them, and Peterson responded that it was Flatoff. A State Patrol Officer then took custody of Peterson.

Lt. Thompson, Lt. O'Bre, and Officer Goetz initially took custody of Moderson, but Moderson was turned over to Officer Heiting and placed in the rear of Officer Heiting's patrol vehicle. Officer Heiting asked Moderson if he was injured, and Moderson responded that he was not. It appeared to Officer Heiting that Moderson may have been one of the initial hostages. Moderson reported that Funk, Erato, and George were still in the building with the shooter. Moderson also reported that his son, Ethan, had been in the building and that Flatoff was holding Funk at gunpoint and stated that if anyone called the police, he would shoot everyone who was there. Moderson indicated that when Flatoff learned that others were in the building, Flatoff told Moderson and Peterson to leave the store, and Flatoff asked how to lock the door. *Id.* ¶ 94. After Officer Heiting determined that Moderson was no longer needed at the scene, he transported Moderson to the area of Wisconsin Avenue and Church Street to meet with his son, Ethan Moderson. Officer Heiting was able to speak with Ethan Moderson and obtain a statement from him as well. Ryan and Ethan Moderson agreed to be interviewed further at the Neenah Police Department. Later that day, Ryan Moderson voluntarily went to the Menasha Police Department to provide a written and signed statement.

5

After returning to the scene, Officer Heiting transported Peterson to the Neenah Police Department where he was turned over to the interview team. Officer Heiting then returned to the scene to act as support and provide transportation.

Three minutes after the officers retreated from Eagle Nation, another burst of gunfire came from the building. Funk left the building holding a firearm, took cover behind a vehicle, and then ran across the alley. He was tragically shot by officers who mistakenly believed Funk was the hostage-taker. *See Mason-Funk*, 895 F.3d at 505. Shortly thereafter, Flatoff was arrested, and the final hostage, Erato, exited the building.

Erato, who was initially in the custody of a Winnebago County Emergency Response Team Member, was turned over to Officer Heiting and placed in the rear of his patrol vehicle. Officer Heiting took Erato's wallet, cell phone, vehicle key, and rosary and transported Erato to the Neenah Police Department. Due to space constraints, Erato was taken to the booking room in an interview room before he was interviewed by Wisconsin Department of Criminal Investigation Investigator Waterstreet. Special Agent Waterstreet made contact with Erato, who was accompanied by his attorney. Erato's attorney agreed to allow Erato to speak with the special agents and remained present during the interview. The special agents informed Erato that he was not under arrest, that he was free to leave at any time, and that he was not required to answer any questions. Erato stated that he understood and agreed to speak with the special agents under the advice of his attorney.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four*

6

*Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

Plaintiffs claim that the Defendant Officers unreasonably seized, detained, and arrested them in violation of the Fourth Amendment. As an initial matter, Defendants assert that the City of Neenah must be dismissed because Plaintiffs have not stated a cognizable claim against the City. Plaintiffs concede that there is no basis for a claim against the City of Neenah. Therefore, the City will be dismissed. In addition, Plaintiffs listed "Steven Doe" and "Sally Roe" as defendants in this action. To date, Plaintiffs have not filed an amended complaint that provides the names of the Doe defendants. Because Plaintiffs have not identified the Doe defendants in a timely manner, their claims against the Doe defendants will be dismissed. The court now turns to Plaintiffs' claims.

**A. Fourth Amendment Claim**

The Fourth Amendment guarantees the right of persons to be free from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. The "general rule" is that "Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (citing *Dunaway v. New York*, 442 U.S. 200, 213 (1979)) (internal quotation marks omitted). Within the

7

framework of this fundamental rule, however, is "some latitude for police to detain where the intrusion on the citizen's privacy was so much less severe than that involved in a traditional arrest that the opposing interests in crime prevention and detection and in the police officer's safety could support the seizure as reasonable." *Id.* at 193 (internal quotation marks and citations omitted). In assessing reasonableness, courts "first consider whether the detention was justified from the outset and then ask 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Matz v. Klotka*, 769 F.3d 517, 524 (7th Cir. 2014) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The court's inquiry is limited to what the officers knew at the time of the seizure, not what has been gained from hindsight. *See Harney v. City of Chicago*, 702 F.3d 916, 922 (7th Cir. 2012) (citation omitted).

Plaintiffs argue that it was unreasonable for the officers to detain them because the officers were repeatedly informed that there was only one gunman who had taken the occupants of Eagle Nation hostage. They assert that because there was no reason for officers to believe this information was untrue, the officers had no probable cause that Plaintiffs had committed a crime. But "[r]estraining an individual may be appropriate in 'inherently dangerous situations,' even if the officers do not suspect the restrained individual of a crime." *Estate of Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020) (citing *Muehler v. Mena*, 544 U.S. 93, 100 (2005)). Indeed, "it may be reasonable for police to detain people not suspected of criminal activity themselves, so long as the additional intrusion on individual liberty is marginal and is outweighed by the governmental interest in conducting legitimate police activities safely and free from interference." *United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013) (collecting cases).

In this case, the dangerousness of the situation the officers faced was obvious. Officers received reports that a hostage-taker had threatened to kill his hostages and that shots had been fired in Eagle Nation. When the hasty team entered Eagle Nation, the officers were met with a

8

barrage of gunfire, which led them to believe that they were being ambushed. A white cloud, later determined to be the result of a bullet striking a fire extinguisher, prevented the officers from identifying who was shooting at them and how many shooters there were. Shortly after the officers' retreat from Eagle Nation, the officers attempted verbal contact and were met with more gunfire. An unidentified man, now known to be Funk, ran out of the building with an unholstered gun in his hand, creating confusion as to whether the hostage-taker had an accomplice. The threat to public safety was serious.

Even though the caller had identified Flatoff as the sole hostage-taker inside Eagle Nation, the officers were not required to bet their lives on the caller's report being 100% true. The officers had a general description of the hostage-taker, but they did not know how many hostages there were, the names of the hostages, or what they looked like. The officers also had reason to believe there was at least one gun on the scene, but they did not know who had firearms or how many they had. Having been met with a fusillade of bullets upon entering the shop and given what they took to be a number of occupants ignoring their instructions, the officers were justified in taking steps to verify who was a suspect and who was a hostage before simply turning everyone loose.

Against the background of the ongoing threat and the rapidly evolving situation, it was reasonable for the officers to conclude that it was necessary to detain Plaintiffs and briefly put them in handcuffs to confirm the individuals' identities and be able to safely investigate without interference. Moderson and Peterson exited the building and were taken into custody while the hostage situation was ongoing. After Moderson was placed in the rear of Officer Heiting's patrol vehicle, Moderson provided information about who was in Eagle Nation and what had occurred. Officer Heiting determined that Moderson was a hostage and no longer needed at the scene and transported Moderson to an area to meet with his son. Later that day, Moderson voluntarily went to the Menasha Police Department to provide a written and signed statement. Peterson advised

9

A-9

that Flatoff was the one shooting at officers, and he was ultimately transported to the Neenah Police Department where he was turned over to the interview team. Erato was the final hostage to exit Eagle Nation after Flatoff was arrested. Erato was turned over to Officer Heiting and placed in the rear of his patrol vehicle. Officer Heiting took Erato's wallet, cell phone, vehicle key, and rosary, and transported him to the Neenah Police Department. After being advised that he was not under arrest, that he was free to leave at any time, and that he was not required to answer any questions, Erato agreed to speak with Wisconsin Department of Criminal Investigation agents, consistent with his attorney's advice. Under these circumstances, Plaintiffs' detention was reasonable and no Fourth Amendment violation occurred.

Defendants also assert that Lt. Eichmann must be dismissed because she had no direct involvement in detaining Plaintiffs. For an individual to be liable under 42 U.S.C. § 1983, she must have directly participated in the constitutional violation. *Palmer v. Marion*, 327 F.3d 588, 594 (7th Cir. 2003). Plaintiffs concede that Lt. Eichmann did not have any contact with Ryan Moderson, Michael Peterson, or Steven Erato, either as hostages or witnesses. Although Plaintiffs argue that Lt. Eichmann was "in charge of the operation," Pl.'s Br. at 37, Dkt. No. 69, they have not demonstrated that Lt. Eichmann was personally responsible for the decision to detain Plaintiffs or knew about any alleged misconduct and chose to ignore, condone, approve, or facilitate it. Therefore, Lt. Eichmann will be dismissed as a defendant.

**B. Qualified Immunity**

Defendants argue, in the alternative, that they are entitled to qualified immunity. Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from civil liability for constitutional violations "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Qualified immunity attaches when an official's conduct

10

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation omitted). Even though qualified immunity is a defense to a § 1983 action, the plaintiff has the burden of overcoming the defense. *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). The plaintiff must show the deprivation of a constitutional or statutory right and the right must be clearly established at the time of the defendants' conduct. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). The Supreme Court has repeatedly cautioned courts "not to define clearly established law at a high level of generality." *City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 & n.3 (2015) (quotation marks omitted). It has instructed:

> An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate. This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.

*Id.* (internal quotation marks and citation omitted). In other words, the court must determine whether a constitutional rule applies with such obvious clarity that it placed the officers in this case on notice that their conduct was unlawful.

Plaintiffs assert that the "right to be free from arrest without probable cause has been clearly established." Pl.'s Br. at 29. But Plaintiffs have not identified, and the court has not found, a controlling case or robust collection of persuasive authority analogous to the instant set of facts that clearly establishes that Defendants' conduct violated Plaintiffs' constitutional rights. As a result, Defendants are entitled to qualified immunity. For this reason as well, Defendants' motion for summary judgment is granted.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 59) is **GRANTED**. The case is dismissed. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 5th day of September, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

12

A-12

# United States District Court

## EASTERN DISTRICT OF WISCONSIN

RYAN MODERSON, et al.,

          Plaintiffs,

    v.

CITY OF NEENAH, et al.,

          Defendants.

**JUDGMENT IN A CIVIL CASE**
Case No. 21-C-272

☐    **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict

☒    **Decision by Court.** This action came before the Court for consideration.

    **IT IS HEREBY ORDERED AND ADJUDGED** that Plaintiffs take nothing and this case is DISMISSED.

Approved:   s/ William C. Griesbach
               WILLIAM C. GRIESBACH
               United States District Judge

Dated:   September 5, 2023

               GINA M. COLLETTI
               Clerk of Court

               s/ Kyle W. Frederickson
               (By) Deputy Clerk